Ruffin, C. J.
 

 There is but little difficulty, we think, in understanding, that, although there was not a trust to procure actual "and open emancipation, the conveyance of the negroes was made upon a secret trust and confidence, tha’ the defendants hold them in. what has been called, a qualified state of bondage — that is, that the donees, as expressed in
 
 Huckaby
 
 v.
 
 Jones, 2
 
 Hawks 120, were to consult the benefit of the negroes and not their own emolument. Sucha trust, when ascertained, must be pronounced illegal, as has been frequently decided ; and, as it cannot be executed as intended and is unlawful, it follows, that, of necessity, there is a trust for the original owner, and those who succeed him. "For if a trust of any kind be intended, the donee of the legal title cannot, in conscience, hold the negroes as property for himself, but
 
 *140
 
 must execute it for some one, and, as there is no one else who can claim, it must be for the donor. It is so under the mortmain acts; and the provisions of our law, as judicially construed, respecting conveyances for emancipation or
 
 quasi
 
 emancipation here, bear strong resem> blance to those acts.
 
 Stevens
 
 v.
 
 Ely,
 
 1 Dev. Eq. 493.
 
 Thompson
 
 v.
 
 Newlin,
 
 3 Ire. Eq. 838. Every country has the right to protect itself from a population, dangerous to its morality or peace ; and hence the policy of the law of this State prevents the emancipation of slaves, with a view to their continuing here
 
 ; Thompson
 
 v.
 
 Newlin, ut supra; Cox
 
 v.
 
 Williams,
 
 4 Ire. 15, and when the purpose is, that the emancipated slaves shall remain here, they cannot be carried away, because it is contrary to the trust, and the doctrine of
 
 cy pres
 
 does not exist with us; and therefore the trust results.
 
 Haywood
 
 v.
 
 Craven,
 
 2 N. C. Law Rep 557
 
 McCauley
 
 v.
 
 Wilson,
 
 1 Dev. Eq. 270.
 
 Bridges
 
 v.
 
 Pleasants, 4
 
 Ire. Eq. 20.
 

 The cases upon this subject shew, that this must be deemed a disposition upon the unlawful trust mentioned. In
 
 Huckaby
 
 v.
 
 Jones,
 
 the bequest was to four persons or the survivors, “to be their lawful property, for them to keep or dispose of, as they shall judge most for the glory of God, and the good of said slaves.” In
 
 Stevens
 
 v. Ely, there was a trust “to permit the negroes to live together on his land and to be industriously employed and continue to exercise a controlling power over their moral condition, and furnish them with the necessaries and comforts of life.” And in
 
 Sorry
 
 v.
 
 Bright,
 
 1 Dev. & Bat Eq. 113, there was an absolute bequest of the slaves, followed by a request, that the donee would '‘admit said negroes to have the result of their own labour, but ever to be under his care and protection.” In each of those cases a trust for the negroes was inferred and held void ; and therefore it was declared that a trust resulted to the representatives of the donor. In the last of them, the trust for the slaves
 
 *141
 
 was inferred, because, as was said, the bounty appeared to be intended for the slaves and not for the nominal donee, who viras made the legal owner, not that he should be master, but that they might have a protector ; an observation that applies equally to the present, case, which is almost literally the same with the other, according to “the real purpose” of the donor, as it is set forth in the answer. The answer, indeed, is not. as candid, as would have been creditable to the defendants. In some parts of it the defendants endeavor to cast some obscurity over the transaction, and mystify the case, by insisting on the legal property under the conveyance, and affecting to consider it as the beneficial ownership bestowed on them “as objects of the intestate’s kindness.” Yet upon the whole answer, from the nature of the transaction, it is very evident, that the conveyances were not made to
 
 the
 
 defendants to their own use, but to the secret use of the slaves themselves. It is true, “the property” was to be in the defendants, that is, apparently and literally speaking. It is also true, that the negroes were not to be carried to another State ; as the purpose was, that the family, husband, wife, and children, were to live here on the land, which the donor also conveyed to the defendants. And it may likewise be true, that emancipation here was not designed, or, rather, expected, as the parties knew that could not be effected. But still that would not come up to the claim of the properly, absolute and unconditional, in the sense in which the defendants wish it to be understood, and as it must be understood, in order to exclude the right of the plaintiffs, namely, as importing a benefit and bounty from the intestate to the defendants in
 
 jure propria. For
 
 the answer further tells us, that the defendants became thus the objects of the donor’s kindness, because he believed they would act fairly and justly towards the negroes. How, then, and why, were the defendants to have this absolute property ? The answer again tells us, it was so as “to
 
 *142
 
 provide for the protection, comfort, and happiness of the woman and her children,” and that was to be effected, not by exacting moderate labour from them as humane masters, but by the defendant’s placing them, upon a .color-able contract “for a small consideration,” or otherwise, with the free negro on the land, no control being exercised over them by the defendants, but such as might be necossary for their proper conduct and maintenance. There could scarcely be a plainer case óf
 
 quasi
 
 emancipation, in violation aud fraud of the law; for the family is only required to maintain themselves and the auihority to be exercised over the children is that, not of owners, but of parents. The answer in the latter part of it says, indeed, “no part of the wishes of the donor extended to the children,” and we confess that we do not know how that is to be understood, consistently with that integrity profe ssed by the defendants and with the previous statements of the answer. For, where the children are first mentioned, they are explicitly put on the same footing with the mother, as objects of the provision; it being for the protection, comfort and happiness of the “woman and her children ;” and, in another place, it is stated, that the donor meant to prevent the separation of “the family” after his death. Besides, the motive of the donor, arising out of his regard for and relation to the mother, as the latter is intimated in the answer, must have extended to the issue. One is, therefore, at a losfe how to understand the meaning of that passage, respecting different intentions as to the woman and her children. If the different parts of an answer be directly contradictory, it would seemproper to take it most strongly against the defendants. "But willing to reconcile the answer to itself, if possible, it has occurred to us, in conjecturing the meaning, that it was probably intended to say only, that the intestate did not declare any express trust, as to any future issue of the woman. If, however, that conjecture be
 
 *143
 
 well founded, it cannot affect the case; for the
 
 status
 
 of the issue depends on that of the mother.
 
 Partus sequilar ventrem.
 

 The plaintiffs are therefore entitled to the relief sought, in respect both to the mother and the children, and to such profits, if any,'as might have been made from the death of the intestate with just deductions ; and the par-ties will take the usual orders for - the proper enquiries. The defendants must be held thus accountable and also' to be liable for costs, on account of their concurrence in. contriving to defraud the law’and policy of the country, by accepting a conveyance upon an illegal trust, kept secret because it was known -to be illegal — and because they have endeavoured unconscientiously to defeat the plaintiffs’ right of recovery, by attempting to set up an> unfounded claim for their own benefit.
 

 Per Curiam.
 

 Decree accordingly.